Pearson, C. J.
 

 The case depends upon the construction of the treaties of 1817 and 1819, between the United States and the Cherokee Indians.
 

 By the 8th article of the treaty of 1817, it is stipulated that “to each and every head of any Indian family, residing on the east side of the Mississippi river, on lands that now are, or may hereafter he surrendered to the United States, who may wish m become citizen1- ofi he United States, the United States do agree to give a reservation of (ilu acres of land to be surveyed, Ac.,” “in which they shall have, a life-estate, with a reversion in feo simple to their children, reserving to the widow her right of dower, and the. register of whose names is to he filed in tin; office of the Cherokee agent, which shall be kept open, Ac., provided, that if any of the heads of families, for wlifim reservations may be made, shall remove therefrom, then, in that case, the right lo revert to the United States.”
 

 The second article of the treaty of 1819, merely reiterates and confirms the right in the manner stipulated in the previous treaty.
 

 Prior to these treaties the Cherokee Indians lived on, and were in possession of a large, body of land, of which the tract in controversy was parcel, within the limits of this State, hut it was conceded that the title to the land was in the State, subject to a right of occupancy on the part of the Indians. That is, the ultimate title was in the State, and the Indians bad only a “ base or <pta lifted fee” so-long as they should continue to occupy the land. :
 

 The object of the treaty was to extinguish the Indian title
 
 *200
 
 for the benefit of the State, by inducing the Indians to remove ; and, in order to meet objections, which were made against entering into the treaty, by some individuals of the tribe, it was agreed that any “ head of a family,” who did not wish to remove, but desired to live where he was, should have a tract of 640 acres allotted to him in severalty, in lieu of the share of the whole, to which he was entitled in common with other members of the tribe.
 

 It was foreseen, that the effect of an allotment or reservation (as it was-termed) to a particular Indian, would simply be to give him a parcel in severalty in the same form, plight, and condition, in which he was before entitled to, the whole in common as a member of the tribe, that is, that he would have a right of occupancy, or¡a base or qualified fee. This was objected to on the part of the Indians, who desired that the reservation should confer an absolute estate in fee simple. This demand could not be yielded to, on the part of the United States, because, among other reasons, it would give to the Indians taking a reservation, a right to alien, and it was apprehended that a great many Indians would be thus induced to take reservations and afterwards sell, and then remove and become re-united to their tribe — a mode of proceeding which ' would greatly prejudice the rights of the State of North Carolina, by taking from her the benefit of selling the land, and "conferring it on the Indians. A compromise was then effected, by which it was agreed that in case any Indian, taking a reservation, should live on the land during his life-time, Ilia children should have an estate in fee simple and his wife dower, but if the Indian should remove from the land, the reservation should be void and of no effect. In this way, it was supposed that a fraudulent abuse of the right to have reservations, was sufficiently guarded against. This explains what, at first, seems singular, that the estate is divided, and a life-estate is given to the head of the family, and a remainder is given to his children in fee simple. Whether this stipulation to give the children an absolute fee simple was valid in respect to the State of North Carolina, or whether, having ta
 
 *201
 
 ken benefit under the main provisions of the treaty, she was not bound by all its provisions, is a question, into which we will not enter, but will assume, for the purposes of this case, that the stipulation was valid. It was certainly reasonable to impose this condition, in order to prove that the reservation was taken
 
 bona fide
 
 by the head of the family, and give some assurance that his children would remain on it. They had no ground to complain, for, as the reservation was acquired by the mere act of the head of the family, it was for him to stipulate upon what terms he would take, it, and, in truth, the stipulation, that in case he complied with the condition, his children should have a fee simple absolute, was a gratuitous concession to them.
 

 The statement made above, in reference to the condition of things at the date of the treaty — the relation of the parties, and tlie purposes for which the treaty was made, taken in connection with the words used in the clause now under consideration, make it manifest that it was the intention only to allow the children of such of the Indians, who took reservations, as continued to live on the land during their lives, to, have estates in the land. In the construction of treaties, the 'intention of the parties is the governing principle, and the courts will not permit it to be defeated, because of an omission to insert technical words, or of an improper use of them. If, by the operation of any rule of law, the “ little savages,” who may happen to be the children of an Indian, who, after having his reservation allotted to him, voluntarily abandoned it and re-united himself to his tribe, are entitled to the land after his death, the result will do violence to the plain intention of the contracting parties, and must be attributed, either to a want of foresight, or of intelligence on the part of the commissioners who made the treaty, or their inability to use words proper to express the meaning of the parties.
 

 1. It is insisted for the plaintiff, that the children of John Welch do not claim under him by descent, but claim as
 
 jpv/rchasers,
 
 by force of the remainder, which is limited to them in fee simple, according to the provisions of the treaties; and
 
 *202
 
 it is a well-settled rule of law, “ where a remainder is limited, a condition annexed to the particular esíate is void, for it is unreasonable that the grantor, by entry to defeat the particular estate, should defeat the estate in remainder, which he had absolutely granted away.” Eearne on Remainders, 271. The rule of law is admitted, but it has no application to our case; for the condition is not annexed to the life-estate only, but is also annexed to the estate in remainder: “provided, that if any of the heads of families, for whom reservations mav be made, 'should remove therefrom, then, in that case, the right to revert to the United States.” .What right ? The right to the land, which, of course, includes the estate in remainder as well as the estate for life. So, the condition is annexed to the whole estate, and authority need not be cited to show, that if the condition is annexed to the whole estate, it makes no difference in respect to the efficacy of the condition to defeat it, whether the whole is granted to one person, or the estate is divided and a part isgiven to one, and the remainder to another person. The life-estate, in the case under consideration, was obviously a matter of minor importance, and tire idea that the purpose of the condition was to defeat that estate only, and leave the remainder in fee simple, to take full force ami effect, leads to an absurdity.
 

 2. It was insisted for the plaintiff: admit that the condition applies as well to the remainder as- to the life-estate, it is a well-settled rule of law, “ when a freehold estate vests, it can only be defeated by force of a condition, by the entry of the grantor, or some act equivalent to entry.” It is a. principle that “an estate that begins by livery, can only be defeated by entn ;” Co. Lit. 218;
 
 Browning
 
 v. Beston, 1 Plow. Rep. 131 ;
 
 Doe
 
 v. Pritchard, 5 B. and Ad. 765, and it is contended that the estate which vested in the children of John Welch, by the limitation of the remainder, has never been divested by entry, or any equivalent act. This rule of law is also admitted, and it is likewise conceded that liad the treaty contained a provision, that it should be carried into effect
 
 by a grant, to
 
 such Indians as took reservations for life, with remainder to
 
 *203
 
 their children and their heirs, and a grant to that effect, had accordingly been issued by the State of North Carolina, with the condition annexed to the whole estate, the remainder in fee simple having thereby vested in the children, would not have been divested by any act that has been done, notwithstanding the breach of the condition.
 

 But no such grant was required by the treaty to be issued, and no such grant has, in fact, been issued. The rights of the children depend merely on the stipulations of ihe treaty.— Their estate'was never executed, but remains and depends on an
 
 executory contract.
 
 So, all the learning in respect to what is necessary to be done, in order to defeat a freehold estate, which has been created by feudal investiture, or by the grant of the sovereign, or by the feofment and livery of an individual, or any conveyance having the like effect, has no application, and the authorities, which were cited, operate against the plaintiff, because they .show that in matters of contract executory, in respect to chattels personal, and likewise chattels real, (see notes to
 
 Dumper’s
 
 case, I Smith’s Leading cases, 15,) a condition that the contract, or a conveyance of a chattel, or a lease for years, shall be void, has, in law, the effect of making the contract, conveyance, or lease for years, void
 
 ipso facto,
 
 on breach of the condition. All the learning in respect to conditional limitations, rests on'the principle, that a use may be defeated by breach of condition without entry.
 

 Our case, then, is narrowed to this: the United States stipulates and agrees that, provided the head of an Indian family, who has taken a reservation, continues to live thereon, he shall have a life-estate, and his children shall have the reversion (meaning the remainder) in fee simple, and the Indian stipulates and agrees, that in case he removes therefrom, the reservation shall be void and of no effect. A treaty, in its legal effect, is an executory agreement. It is clear, therefore, the act of voluntary removal operated
 
 ipso facto,
 
 to defeat the whole reservation.
 

 The fallacy of the argument, upon which the claim of the plaintiff is put, arises from a failure to distinguish the case of
 
 *204
 
 a remainder, created by an executed conveyance, such as a grant or feofmeut, and the case of an interest in remainder, which rests on mere treaty stipulations or an executory agreement, (which is our case) where the rules of law are not so rigid, and greater latitude is allowed, in order to effectuate the intention of the contracting parties. The well-established distinction between an executed and an executory trust, i. e., one resting on articles, furnishes an analogy, and an apt illustration.
 

 The opinions of Attorney General, Legare, and of Attorney General, Clifford, vol. 4. Opinions of Attorneys General, at page ISO and 619, will be found to sustain our conclusion, and also the ease of
 
 Kennedy
 
 v. McCartney, 14 Ala. Rep. 142.
 

 It has been considered unnecessary to discuss the count on the demise of the widow, as her title rests on the same questions, and is further complicated by the fact, that a widow has no estate until dower is assigned to her.
 

 Judgment in the Court below is reversed, and judgment of nonsuit on the case agreed.
 

 Per Curiam,
 

 Judgment reversed.